Fernando TRUJILLO, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A02–0308–CR–727.

Court of Appeals of Indiana.

April 15, 2004.

---

Jose D. Salinas, Salinas Law Office, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Richard C. Webster, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

On January 16, 2003, the State charged Fernando Trujillo with two counts of Child

Molesting, one as a Class A felony and the other as a Class C felony. The charges alleged in relevant part that Trujillo had molested four-year-old C.M. On June 25, 2003, the trial court conducted a Child Hearsay Hearing under Indiana Code Section 35–37–4–6 to determine the admissibility of certain evidence. Following adverse evidentiary rulings, Trujillo brings this interlocutory appeal and raises two issues for review:

1. Whether the trial court abused its discretion when it determined that Mother may testify at trial regarding statements C.M. made to her about the alleged molestation.

2. Whether the trial court abused its discretion when it determined that C.M.'s videotaped interview is also admissible.

We affirm.

## FACTS AND PROCEDURAL HISTORY

In January 2003, C.M. lived in an apartment on 38th Street in Indianapolis with her mother, Reyna Gregerios ("Mother"), her father, Alvaro Murietta ("Father"), her then eight-year-old brother, and Trujillo.[1] The apartment had two bedrooms, and Mother, Father, and their two children slept in one, while Trujillo slept in the other. On Sunday, January 12, Father, who usually worked at night, received a call from his employer asking him to report at 5:00 a.m. Monday morning. Mother was also scheduled to work on Monday from 7:00 a.m. to 3:30 p.m. On Sunday evening, Mother called her sister-in-law, Imelda Lopez, to see if she could watch C.M. during the day. Lopez agreed. On

Monday morning, Mother told her son, who got on the school bus around 8:30 a.m., to walk C.M. to Lopez's house before he left for school. Mother then left for work while C.M. was still asleep. C.M.'s brother and Trujillo were also in the apartment.

Mother arrived home from work around 4:00 p.m. After C.M. got back to the apartment, she and Mother were in their bedroom talking. Mother asked C.M., as she always did when Lopez watched her during the day, whether she had eaten and whether she was treated well. C.M. then told Mother that Trujillo, whom C.M. called "Huero," had grabbed her, laid her on his bed, took off her clothes, and put his "pilin" in her "culito."[2] C.M. also told Mother that it had hurt and that it had happened that same morning before her brother had left for school. After C.M. stated that she felt "dirty," Mother removed C.M.'s underwear and smelled a strange odor.

Father arrived home around 9:00 p.m., and Mother told him about C.M.'s allegations. After Father talked to C.M., Mother and Father took her to St. Vincent's Hospital for an examination. Mother spoke with police officers there, but the officers did not interview C.M. Instead, the officers told Mother and Father to take C.M. to the Family Advocacy Center on the afternoon of January 15. The family returned home during the early morning hours of January 14. That day, C.M. appeared upset but played with her brother. Father asked C.M. about the incident again because he did not believe her story,

---

1. Trujillo is Father's cousin.

2. C.M. speaks only Spanish. The record shows that when she used the word "pilin," she was referring to "penis." When she said "culito," she meant her vagina. We note that

the transcript and the court's findings and conclusions contain conflicting spellings for those words. We will refer to the spellings that appear in the transcript.

and C.M. told him the same version of events she had told her mother.

On the afternoon of January 15, two days after the alleged incident, Mother, Father, C.M., her brother, and Trujillo all went to the Family Advocacy Center. Indianapolis Police Detective Cathy Gregory interviewed C.M. outside the presence of other family members, and that interview was videotaped. Tatiana Mitchell, a bilingual caseworker with the Marion County Office of Family and Children ("OFC"), was also present during the interview and served as an interpreter. Initially, C.M. was quiet and fairly nonresponsive. Then, after Mitchell asked C.M. whether she knew why she was there, C.M. spontaneously stated that Trujillo had taken off her clothes and placed the tip of his "pilin" in her "culito." Mitchell told Detective Gregory that the literal translation for "culito" was "little butt." [3] Mitchell then asked C.M. to clarify what she meant by "culito," and C.M. repeatedly pointed to her vaginal area. She also stated that this happened on Trujillo's bed and that it hurt a little bit.

On June 25, 2003, the trial court conducted a Child Hearsay Hearing under Indiana Code Section 35–37–4–6. After C.M. testified, the court determined that she was not competent to testify at trial. However, after hearing testimony from Mother, Mitchell, and Detective Gregory, the court determined that Mother could testify at trial regarding C.M.'s hearsay statements and that C.M.'s videotaped interview is also admissible. Specifically, the trial court issued the following findings:

1. [C.M.], the alleged victim in this case, was four (4) years old at the time of the alleged incident and was five (5) years old at the time of the child hearsay hearing. She was called to testify at the child hearsay hearing and was available for cross-examination. She was deemed incompetent to testify as she is not able to comprehend the nature and obligation of an oath. Although C.M. was able to distinguish right from wrong when asked about the colors of crayons, she was not able to tell the difference between a truth and lie and what the consequences might be if she ever told a lie.

2. The charged incidents of child molesting as a Class A felony and a Class C felony are alleged to have occurred on or about January 13, 2003.

3. Normally C.M.'s father would take care of C.M. during the day while [Mother] worked. But on Sunday, January 12, 2003, the father's boss called and wanted him to come to work early the next morning. [Mother] called her sister-in-law Sunday night to make arrangements for her sister-in-law, Imelda Lopez, to take care of C.M. the next day when [Mother] was at work. [Mother] then instructed her son to walk C.M. over to his aunt's apartment when he was getting ready to leave to get on the bus. C.M.'s brother normally catches the bus at 8:30 a.m.

4. On January 13, 2003, [Mother] left her apartment before 7:00 a.m. At the time, her son and

---

**3.** At the hearing, Mitchell testified that the literal translation for "culito" is "little tail," or "little butt."

C.M. were still in the apartment with [Trujillo]. [Mother's] husband had already left for work. As she left, [Mother] believed that her son would take her daughter over to the aunt's apartment.

5. [Mother] went over to the aunt's apartment to pick up her daughter after work (between 3–4:30 p.m.) and took her back to the family's apartment. No evidence was presented as to the nature of C.M.'s activities while she was under the care of her aunt, but C.M. usually got along fine with her aunt. As was her customary practice, [Mother] asked C.M. if "she's eaten and how she was treated." C.M. told her mother that her brother had not taken her to her aunt's apartment because Huero (the name C.M. uses to address [Trujillo]) said he would take C.M. over there. C.M. told her mother that her panties were dirty. C.M. then described that Huero pulled down her pants and underwear and stuck his ["pilin"] (Spanish word for penis) inside her ["culito"] (the word that C.M. uses for vagina). C.M. said that it happened in [Trujillo's] room on his bed. At the time that [Mother] was talking to her daughter, C.M.'s brother went outside to play. Trujillo and [Father] were not present at that time. [Mother] had C.M. change her underwear. [Mother] noticed an odd odor on C.M.'s underwear that smelled like a penis. C.M.'s brother confirmed that he had not taken C.M. to their aunt's house.

6. When [Father] came home later that evening, [Mother] relayed to him what happened. Then they took C.M. to St. Vincent's Hospital on the evening of January 13, 2003. Medical personnel examined C.M. that night. At the hospital, the police were called and arrived late that evening to speak to the family (but did not talk to C.M.).

7. [Mother, Father,] and C.M. left St. Vincent['s] and returned to their home on the morning of January 14, 2003. All members of C.M.'s family and [Trujillo] remained at the residence on January 14, 2003 and into January 15, 2003. On January 14, 2003, C.M. seemed upset but played a little bit with her brother that day. [Mother] did not talk to C.M. any further about what had happened, but C.M.'s father talked to C.M. about the events of January 13, 2002[,] because he didn't believe C.M. Despite her father's nonsupportive stance, C.M. repeated her account in a consistent manner.

8. On January 15, 2003, [Mother, Father], C.M., and [Trujillo] all went to the Family Advocacy Center and were interviewed.

9. The family went to the Family Advocacy Center because they had been given a paper at the hospital indicating that they had to report there. Not much explanation, if any, was given to C.M. about why she was coming to the Family Advocacy Center as she was at first concerned that she was going to be receiving a shot. Det. Cathy Gregory and Tatiana Mitchell from Child

Protective Services assured C.M. that she was not going to receive a shot.

10. Although not the case worker assigned, [Mitchell] sat in on the interview to interpret for C.M. [Mitchell] has spoken Spanish her entire life. She attempted to translate verbatim or to translate as accurately as possible what C.M. was saying in response to questions asked. The entire encounter between [Mitchell], Det. Gregory and C.M. was videotaped and occurred in a quiet, separate room from the rest of C.M.'s family saying more than a verbatim repetition of Det. Gregory's questions. These conversations were designed to clarify C.M.'s statements.

[11.] After being fairly non-responsive during the initial part of the interview, and in a delayed response to a question as to if she knew why she was in the interview, C.M. spontaneously stated that Huero took off her pants and underwear and put his ["pilin"] in her ["culito"] (literal translation meaning "little butt") and pointed to her vaginal area. Mitchell conversed with C.M. to clarify what C.M. meant by ["culito"] and the gestures on the tape indicate that C.M. was referring to her vaginal area. C.M. indicated that Huero did this to her in the house when she was in his bed because he has a room in the house. After a while, he took C.M. to her aunt's house. C.M. described that it hurt a little but not too much. She also advised that her brother wasn't there. She also reported that her panties smelled and that she talked with her mother about what happened. She advised [that Trujillo] was her cousin.

[12.] [Mother] testified at the child hearsay hearing that [Trujillo] had been living . . . at the family's apartment. The children had their own bedroom. Up until the time of this disclosure, the family got along well with Defendant with no problems.

The court then concluded in relevant part:

4. The statements C.M. made to her mother on January 13, 2003, bear sufficient indications of reliability to admit them under I.C. 35–37–4–6. The statements were made the same day after the alleged incident. C.M. had no motivation to lie since the family got along with [Trujillo]. In fact, he even stayed with C.M.'s family. During her conversation with her mother, C.M. used age-appropriate terminology and used a term, ["culito,"] that her mother had heard C.M. use before when talking about her vagina. Further, C.M.'s initial disclosure was in response to [Mother's] customary practice of asking C.M. if she had eaten and how she had been treated that day. At no point did [Mother] suggest any answers to C.M. Other corroborating evidence exists to support the reliability of the statement. . . . [Mother] noticed the unusual smell on C.M.'s panties.

5. Likewise, C.M.'s statements to Det. Gregory and [Mitchell] bear sufficient indications of reliability to admit them under I.C. 35–37–4–6. The interview was conducted only two days after C.M.'s initial disclosure and only two days after the alleged incident occurred. Although C.M. had undergone a medical exam at St. Vincent['s] Hospital prior to

talking to Det. Gregory and [Mitchell], C.M. had a day to recover from any possible stress from the encounter. And in fact, there is no evidence that the examination caused her stress. C.M. had not in any way been coached; rather, when faced with an unsupportive father, C.M. continued to repeat the allegations in [a] consistent fashion. The interview with Det. Gregory and [Mitchell] took place in a neutral location. No other persons, other than Det. Gregory, [Mitchell], and C.M. were present in the room during the interview. C.M.'s description of how [Trujillo] molested her, indicating how it hurt a little for her, what clothes [Trujillo] took off C.M., and where the activity occurred and what happened afterwards came in spontaneous answers to non-leading questions. C.M. used age-appropriate terminology for body parts during the interview and explained the use for [those] body parts. Further, C.M. repeated to Det. Gregory and [Mitchell] the same information that she had given her mother, giving some additional detail about pain sensations and how far [Trujillo] had opened her vaginal area and placed his ["pilin"] inside her. While the translation was not in the verbatim manner that the court is used to, there is no evidence before the court that the translation given as to what C.M. said was inaccurate. And, as the answers that are given by C.M. are recorded, [Trujillo] was free to provide the Court with what he considered to be a "true translation" if he thought the answers were inaccurate. The Court will not speculate as to an inaccuracy that was not placed in evidence. The cases cited by [Trujillo] are distinguishable be-

cause the interpreters discussed there are used to create a record of proceedings, and to provide translation services to the Court and/or jury in a simultaneous real-time setting. Here, the tape was complete before the Court or jury ever saw it, and [Trujillo] has a pre-trial opportunity to challenge the translation. No such challenging evidence was offered.

This appeal ensued.

## DISCUSSION AND DECISION

### Standard of Review

"[T]he decision to admit or exclude evidence is within a trial court's sound discretion and is afforded great deference on appeal." *Carpenter v. State*, 786 N.E.2d 696, 702 (Ind.2003). An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or it misinterprets the law. *Id.* at 703. But as the court in *Carpenter* explained: "At the same time, the protected person statute impinges upon the ordinary evidentiary regime such that we believe a trial court's responsibilities thereunder carry with them what we recently called in another context 'a special level of judicial responsibility.'" *Id.* (quoting *Cox v. State*, 706 N.E.2d 547, 551 (Ind.1999)).

### Indiana's Protected Person Statute and Relevant Case Law

Indiana Rule of Evidence 801(c) defines hearsay as "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is not admissible except as provided by law or the evidence rules. Ind. Evidence Rule 802. It is undisputed that C.M.'s statements to Mother, as well as

her videotaped interview with Detective Gregory, constitute hearsay.

But as this court explained in *Guy v. State,* 755 N.E.2d 248, 252 (Ind.Ct.App. 2001), *trans. denied:*

> The Indiana General Assembly created special procedures for introducing evidence that is "not otherwise admissible" in cases involving crimes against children. These procedures have been codified in Indiana Code [S]ection 35–37–4–6 which is known as the "protected person" statute. The Indiana Supreme Court has stated that the "goal of this statute is to reduce the child's emotional trauma caused by numerous court appearances." *Miller v. State,* 517 N.E.2d 64, 73 (Ind.1987).

Specifically, Indiana Code Section 35–37–4–6 applies, in part, to sex crimes (IC 35–42–4), including child molesting. *See* Ind. Code § 35–42–4–3. Under the statute, "protected person" includes a child who is less than fourteen (14) years of age. The statute provides that a statement or videotape that: (1) is made by a person who at the trial is a protected person; (2) concerns an act that is a material element of an offense listed in subsection (a) that was allegedly committed against the person; and (3) is not otherwise admissible in evidence, is admissible in evidence in a criminal action for an offense listed in subsection (a) if the requirements of subsection (d) are met. I.C. § 35–37–4–6(c). The remainder of the statute provides in relevant part:

> (d) A statement or videotape described in subsection (c) is admissible in evidence in a criminal action listed in subsection (a) if, after notice to the defendant of a hearing and of his right to be present, all of the following conditions are met:
>
> (1) The court finds, in a hearing:
>
> (A) conducted outside the presence of the jury; and
>
> (B) attended by the protected person; that the time, content, and circumstances of the statement or videotape provide sufficient indications of reliability.
>
> (2) The protected person:
>
> (A) testifies at the trial; or
>
> (B) is found by the court to be unavailable as a witness for one (1) of the following reasons:
>
> \* \* \*
>
> (iii) The court has determined that the protected person is incapable of understanding the nature and obligation of an oath.
>
> (e) If a protected person is unavailable to testify at the trial for a reason listed in subsection (d)(2)(B), a statement or videotape may be admitted in evidence under this section only if the protected person was available for cross-examination:
>
> (1) at the hearing described in subsection (d)(1); or
>
> (2) while the statement or videotape was made.

*Id.*

Before we address Trujillo's arguments, we review two opinions our supreme court has issued which address a trial court's role in determining the reliability of a protected person's hearsay statements under Indiana Code Section 35–37–4–6. In *Pierce v. State,* 677 N.E.2d 39, 44 (Ind. 1997), the court discussed the importance of that reliability determination as follows:

> In many child molestation cases, as in this case, the account of the victim is important—and sometimes the only— evidence as to the occurrence of a crime or the identity of the perpetrator, or both. The victim is often an incompe-

tent witness if the [protected person] statute comes into play. Trial courts consequently must use special care when making findings of sufficient indications of reliability under the statute because these findings act as the sole basis for finding the trustworthiness that permits introduction of otherwise inadmissible hearsay. *Considerations in making the reliability determination under the statute include the time and circumstances of the statement, whether there was significant opportunity for coaching, the nature of the questioning, whether there was a motive to fabricate, use of age appropriate terminology, and spontaneity and repetition. Lengthy and stressful interviews or examinations preceding the statement may cast doubt on the reliability of the statement or videotape sufficient to preclude its admission.*

(Citations omitted, emphasis added).

In *Pierce,* three-year-old K.D. was shopping at Wal–Mart with her mother. The defendant saw K.D. looking at toys alone and led her outside and into his vehicle, where he placed his hand inside her pants. *Id.* at 42–43. When the mother located K.D. with the help of Wal–Mart employees, K.D. told her mother what had happened. That same day, K.D. told law enforcement officers the same version of events. The mother then took K.D. for a physical examination, and later that day, K.D. gave a videotaped interview during which her mother was present. *Id.*

Our supreme court affirmed the trial court's reliability determination regarding statements the child had made to her mother and police officers because those

statements "were spontaneous and occurred 'a very short time' after the alleged molestation occurred." *Id.* at 45. Indeed, the child's statements were not prompted or suggested, and the child told the same version of events to her mother and the officers within a short period of time. *Id.* Also, the court found significant that the mother, who had been the only person alone with the child between the time the events were reported and the child's statements, was "available for cross-examination at the [child hearsay] hearing as to the potential for any implantation or cleansing of [the child's] story." *Id.* at 45. In determining that the child's statements to her mother and police officers were reliable, the court concluded as follows: "The trial court made a judgment call based on its overall assessment of witness credibility and the substance of the mother's and the officers' testimony. We see no abuse of discretion." *Id.* (footnote omitted).

However, regarding the videotaped interview, the court assumed without deciding that those statements did not bear sufficient indications of reliability under the statute because (1) the interview did not occur until several hours after the alleged molestation, (2) the interview occurred soon after the child had been physically examined, and (3) the child's mother, who was present during the interview, suggested several answers and asked leading questions of the child. *Id.* at 45.[4]

A few years later in *Carpenter,* the court, like it had done in *Pierce,* addressed the admissibility of certain statements made by a child who had been determined incompetent to testify at trial. In *Carpen-*

---

4. Unlike here, the defendant in *Pierce* appealed the admissibility of the videotaped statement after trial and conviction. While our supreme court suggested that the videotaped statement should not have been admitted, the court held that the defendant did not show reversible error because the videotaped statement was merely cumulative of statements the child had made to her mother and police officers, which were properly admitted under the protected person statute. *See Pierce,* 677 N.E.2d at 45.

*ter,* on the morning of May 19, 2000, after her father had left for work, A.C. complained to her mother that her father had "put his fingers in her 'moo moo,'" a term the child used to describe her vagina. 786 N.E.2d at 698. The mother contacted law enforcement that same day, and the child gave a videotaped statement of the incident. The child was also examined by a physician that day. A few days after A.C. talked her mother, she told her grandfather about the incident. *Id.* at 702.

After comparing the facts in *Pierce,* the court in *Carpenter* reversed the trial court's reliability determination as to the statements the child had made to her mother and grandfather and the videotaped interview. The court explained its decision in relevant part as follows:

> [O]n the broader issue of whether there [were] sufficient indicia of reliability to present the statements of the mother and the grandfather and the videotape to the jury, we are unable to sustain the trial court's ruling. In *Pierce,* we found highly significant that the child's statements were spontaneous and occurred a very short time after the alleged molestation. It is true that [the child in this case] repeated the same or similar statements to her mother, to her grandfather, and on the videotape. *But here there is no evidence at all as to when the alleged molestation occurred. That is, while the evidence supports a conclusion that the mother sought both medical attention and the intervention of law enforcement after her conversation with A.C. on May 19, there is absolutely nothing in the record to tie the alleged molestation to May 19 or any other date.* Indeed[,] by alleging in its charging information that the offense occurred "on or before April 1, 2000 and May 19, 2000," the State effectively concedes there was a period exceeding six

weeks during which the alleged molestation could have taken place.

*Id.* at 703 (emphasis added). The court also found relevant that A.C. had given the videotaped interview several hours after the alleged molestation and after having undergone a physical examination. *Id.* And A.C.'s statements to her grandfather occurred at least a full day after her statements to her mother and her videotaped interview. *Id.* at 704. Overall, the court was concerned "that intervening delay created the potential for an adult to plant a story or cleanse one." *Id.* at 703.

Further, the court in *Carpenter* gave some consideration to the fact that A.C. was not competent to testify at trial, which affected the reliability of her statements to others. The court explained: "While it is certainly true that the protected person statute provides that a statement or videotape made by a child incapable of understanding the nature and obligation of an oath is nevertheless admissible if the statute's requirements are met, there is a degree of logical inconsistency in deeming reliable the statements of a person who cannot distinguish truth from falsehood." *Id.* at 704. The court concluded that the child's statements to her mother and grandfather and the videotaped interview were not admissible under the statute because (1) there was no indication that A.C.'s statements were made close in time to the alleged molestations, (2) the statements themselves were not sufficiently close in time to each other to prevent implantation or cleansing, and (3) A.C. was unable to distinguish between truth and falsehood. *Id.*

### I. C.M.'s Statements to Mother

■ Relying on the decisions in *Pierce* and *Carpenter,* Trujillo asserts that the trial court abused its discretion when it concluded that C.M.'s statements to Mother have sufficient indications of reliability

under the protected person statute. Trujillo contends that (1) the statements occurred more than eight hours after the alleged molestation; (2) there is no evidence concerning C.M.'s activities while she was at Lopez's house after the molestation allegedly occurred; and (3) there is no evidence of whether other people had contact with C.M. during the day before C.M. told Mother. Accordingly, Trujillo claims that "the State could not eliminate the possibility of implantation or cleansing by some unknown source prior to the statement being made to her mother." We disagree.

In *Pierce,* the child's statements to her mother were spontaneous and occurred shortly after the alleged molestation. Here, C.M. told her mother about the alleged incident (1) soon after she arrived home from her aunt's house, and (2) soon after she saw her mother for the first time that day. In addition, as the trial court pointed out, C.M. made the statements in response to her mother's non-leading, non-suggestive inquiry about how her day had gone and whether she had eaten. The evidence shows that Mother often asked C.M. those questions when Lopez watched C.M. and, thus, C.M.'s unsolicited description of the alleged molestation was spontaneous. And even though C.M.'s statements to Mother occurred several hours after the alleged incident, we find it significant that C.M. told her mother at the first opportunity to do so. Also, unlike in *Carpenter,* where there was no evidence regarding the date of the molestation, it is clear that the alleged incident in this case occurred on the morning of January 13, 2003.

Further, C.M. used age-appropriate language to describe the alleged incident, and C.M. had no motivation to lie. *See Pierce,* 677 N.E.2d at 44 (stating motive to fabricate and use of age-appropriate

terminology are factors to be considered in determining reliability). Trujillo, who is Father's cousin, was staying with the family at the time, and Mother testified that the family had not had any problems with Trujillo. Additionally, even though Father did not believe C.M., she told him the same version of events that she had relayed to Mother. In sum, we conclude that the trial court did not abuse its discretion when it determined that C.M.'s statements to Mother provide sufficient indications of reliability and are admissible under Indiana Code Section 35–37–4–6.

## II.  Videotaped Interview

■  Next, Trujillo maintains that the trial court abused its discretion when it determined that C.M.'s videotaped interview with Detective Gregory is admissible. Specifically, Trujillo asserts that: (1) the court erred when it concluded that C.M.'s statements made during the videotaped interview provide sufficient indications of reliability, and (2) Mitchell's translation during the interview does not bear sufficient indications of reliability. We address those arguments in turn.

As we explained above, the videotaped interview at issue in *Pierce* was problematic because the interview did not occur until several hours after the alleged molestation, it occurred after a "potentially disorienting physical examination," and the child's mother, who was present during the interview, suggested several answers and asked her child leading questions. 677 N.E.2d at 45. The court had similar concerns with the videotaped interview in *Carpenter* because in that case, although the interview occurred on the same day the child reported the alleged molestation, there was no evidence establishing when the molestation had occurred. 786 N.E.2d at 703. As the court in *Carpenter* noted, the incident could have occurred up to six weeks before

the videotaped interview. *Id.* And as in *Pierce*, the interview in *Carpenter* occurred after the child had been physically examined. *Id.*

In some respects, the decisions in *Pierce* and *Carpenter* weigh against the trial court's reliability determination in this case. For example, the interview in *Pierce* occurred several hours after the alleged molestation and, here, the interview occurred two days after the alleged incident. And as in both *Pierce* and *Carpenter*, C.M.'s interview occurred after a physical examination. But as the court in *Pierce* acknowledged, in addition to the several enumerated considerations discussed in that case, "[t]here are undoubtedly many other factors [a court may consider] in individual cases." *Id.* at 44.

For example, unlike in *Pierce*, where the child's mother was present during the interview, suggested answers, and asked leading questions, Detective Gregory interviewed C.M. outside the presence of any family members and asked no leading questions. And unlike in *Carpenter*, where there was no evidence of exactly how far removed the date of the interview was from the date of molestation, here it is undisputed that the incident allegedly occurred on the morning of January 13, 2003, and that C.M.'s interview occurred two days later. Regarding the concern that intervening delay may create the potential for an adult to plant or cleanse a story, the trial court found, and the evidence at the hearing supports that finding, that Mother did not talk to C.M. about the alleged incident after C.M.'s initial disclosure. Indeed, Mother testified that she did not talk to C.M. about the incident after they returned from the hospital. She also stated that she did not tell C.M. why they were taking her to the Family Advocacy Center on January 15, 2003. And while Father asked C.M. about the alleged incident,

C.M. told him the same version of events that she had told Mother despite his skepticism. Thus, the evidence supports the conclusion that "C.M. had not in any way been coached."

In addition, the court in *Pierce* acknowledged that "[l]engthy and stressful interviews or examinations preceding the statement may cast doubt on the reliability of the statement or videotape sufficient to preclude its admission." 677 N.E.2d at 44. Although C.M. gave her videotaped interview after being examined at St. Vincent's Hospital, the trial court concluded that C.M. had a day to recover from any stress that examination may have caused and, in fact, that there was no evidence that the examination caused C.M. stress. The court also noted that C.M. used age-appropriate terminology during the interview and that she described the alleged incident spontaneously in response to Detective Gregory's question about whether she knew why she was at the Family Advocacy Center. Based on our review of the videotaped interview, the transcript of the child hearsay hearing, and the trial court's findings and conclusions, we conclude that the circumstances surrounding C.M.'s videotaped interview do not raise all of the same concerns at issue in *Pierce* and *Carpenter*. We therefore hold that the trial court did not abuse its discretion when it determined that the videotaped interview bears sufficient indications of reliability for admissibility under Indiana Code Section 35-37-4-6. *Cf. M.T. v. State*, 787 N.E.2d 509, 512 (Ind.Ct.App.2003) (distinguishing *Carpenter* and *Pierce* where videotaped interview occurred two days after child's initial statement).

■ But Trujillo also contends that the videotaped interview should be excluded at trial because of alleged problems with Mitchell's role as an OFC caseworker and the possibility of biased translation. In

support of his arguments, he relies heavily on Mitchell's testimony at the hearing that when she translates conversations, as opposed to written words, she does not always provide a verbatim translation. He also claims that the translation is not reliable because Mitchell works as a caseworker and was asked to translate C.M.'s interview at law enforcement's request.

As the trial court noted in its findings and conclusions, Trujillo speculates that Mitchell's translation may not be reliable, but he was able to cross-examine her at the hearing and failed to present any evidence or even suggest that Mitchell's translation was not accurate. Indeed, the trial court questioned Mitchell at the hearing and the following colloquy occurred:

QUESTIONS BY THE COURT

Q: Ma'am, did you in any way in your translation change the, in your mind, change the meaning of what [C.M.] told you had happened to her?

A: Absolutely not.

Q: Okay.

A. On the contrary, it was [in] my interest to know that the words she was using [were the same words] I understood.

Q: Right. Right. Okay, thank you.

We agree with the trial court that it should "not speculate as to an inaccuracy that was not placed in evidence" and that Trujillo "has a pre-trial opportunity to challenge the translation." Thus, his arguments regarding the reliability of Mitchell's translation are misplaced.

## CONCLUSION

We hold that the trial court did not abuse its discretion when it concluded that C.M.'s hearsay statements to her mother and her videotaped interview are admissi-

ble at trial under Indiana Code Section 35–37–4–6.

Affirmed.

BAKER, J., and MAY, J., concur.