**Robert L. SCOTT, Appellant– Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 79A05–0812–CR–746.

Court of Appeals of Indiana.

March 25, 2010.

Transfer Denied June 3, 2010.

---

Cara C. Putman, Jason W. Bennett, Lafayette, IN, Attorneys for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Ellen H. Meilaender, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

SHARPNACK, Senior Judge.

### STATEMENT OF THE CASE

Defendant–Appellant Robert L. Scott appeals his convictions of two counts of Class B felony possession of a firearm by a serious violent felon (Ind.Code § 35–47–4–5(c)); one count of Class C felony battery with a deadly weapon (Ind.Code § 35–42–2–1); one count of Class D felony of pointing a firearm (Ind.Code § 35–47–4–3); and one count of Class A misdemeanor resisting law enforcement (Ind.Code 35–44–3–3). We affirm in part and remand in part.

### ISSUES

Scott raises three issues for our review, which we restate as:

I. Whether the trial court abused its discretion in admitting evidence obtained from Scott's residence.

II. Whether the trial court erred in refusing to give a tendered instruction.

III. Whether the trial court erred in admitting certain evidence in its determination that Scott was a serious violent felon.

### FACTS AND PROCEDURAL HISTORY

In the early morning hours of January 6, 2008, Thea and Jeremy Dalton were working at a bar in Lafayette, Indiana, when a person they knew as "Deek," who was later identified as Scott, came into the bar. Scott was not welcome in the bar, so Thea told him to leave. Scott refused to leave and followed Thea behind the counter, so she shoved him and again told him to leave. Thea called the police while Jeremy told Scott to leave. Scott told Jeremy to "keep [his] woman under control," or "South Florida was going to come back and visit [them] and bullets would be flying." (Tr. at 109–10). Scott left the building, with Thea and Jeremy following.

Lafayette Police Officer Chris Cudworth arrived on the scene within a minute of the dispatch. He was driving a patrol car and was in uniform, including a windbreaker clearly marked with police insignia. Officer Cudworth attempted to stop Scott, but Scott spun around and hit him in the middle of the chest. Upon realizing that Scott had a gun in his hand, Officer Cudworth took a step backward and fell in the mud. He saw Scott look at the gun in his hand with wide eyes and then run away through the mud. The gun appeared to be a derringer.

Scott eventually eluded Officer Cudworth, and Detective Daniel Shumaker was assigned to investigate the incident. On the evening of January 6, 2008, Detective Shumaker believed he had identified "Deek's" name and address. Due to the nature of the incident that morning, Detective Shumaker, who was in plain clothes, took several uniformed officers with him to the address for a "knock and talk" to determine whether the "Scott" at the address was the person the police wanted to question. Three officers were stationed in the back of the house, out of the Scott's sight, and two uniformed officers accompanied Detective Shumaker to the door.

Detective Shumaker knocked several times before hearing a response. A few minutes later, Scott opened the door and invited the detective to come into the house. Detective Shumaker asked Scott to step outside and speak with him. Scott matched the description given by Officer Cudworth as the man he had chased that morning. A woman also exited the house,

and Scott assured Detective Shumaker that there was no one else inside.

Detective Shumaker was concerned that there were others in the house, and he asked Scott whether officers could search the house to look for other individuals. Scott, who was not under arrest, agreed to the search. Officer Amor came around the house and joined Officer Gard in the one- to two-minute search. The officers noticed a door immediately to the right of the front door, and they entered the room, which turned out to be a bedroom. The officers observed that a mattress and box spring set was on the floor, and because they knew from experience and training that individuals sometimes hide in hollowed out box springs, they moved the mattress. No one was hiding therein, but the officers did find a muddy, loaded derringer.

During the time of the search, Scott was not handcuffed, no guns were pointed at him, and he was not under arrest. In response to a question by Detective Shumaker, Scott revealed that there was a nine-millimeter handgun under the couch and a derringer under the mattress. After being alerted to the additional gun, Officer Amor went back inside and recovered the nine millimeter. Police officers also recovered a muddy jacket and muddy blue jeans from the bedroom, items that Scott's girlfriend said were worn by Scott on the previous evening.

Detective Shumaker told Scott that he would like to obtain a statement about what happened at the bar. Scott told him that he had gone to the bar, left after a disagreement, and that as he left, someone approached him from behind. Scott said that he spun and jammed the person with his index finger. After several requests, Scott revealed his name, birth date, and social security number. He agreed to come to the station to give a statement,

and on the way to the station he was arrested when Detective Shumaker learned that there was an active warrant from Florida for Scott's arrest. Scott was subsequently advised of his *Miranda* rights.

The State charged Scott with the above-mentioned offenses. Scott filed a motion to suppress, arguing that the search was illegal because it was neither a valid protective sweep nor the result of voluntary consent. The motion, which also challenged the admissibility of Scott's admission of the nine-millimeter handgun's location, was denied. Scott was tried by a jury and found guilty of battery, pointing a firearm, and resisting law enforcement. During the second phase of the bifurcated proceedings, the trial court found Scott guilty on the serious violent felon charges.

Scott was sentenced to a total of twenty-nine years—eight years on the C felony battery, with three years concurrent for the D felony pointing a firearm; plus one year for the misdemeanor resisting law enforcement, with twenty years on each B felony firearm possession conviction. The B felony convictions were concurrent with each other but consecutive to the rest.

Scott now appeals.

## DISCUSSION AND DECISION

### I. ADMISSION OF EVIDENCE

#### A. THE SEARCH AND THE DERRINGER

■ Scott contends that the trial court abused its discretion in admitting the derringer and the nine-millimeter gun into evidence. A trial court has broad discretion in ruling on the admissibility of evidence. *Washington v. State*, 784 N.E.2d 584, 587 (Ind.Ct.App.2003). We will reverse a trial court's ruling on the admissibility of evidence only when the ruling

constitutes an abuse of the court's discretion. *Id.* An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court. *Id.*

The State contends that Scott has waived this argument because trial counsel failed to make timely objections to evidence regarding the derringer. A pretrial motion to suppress does not preserve an error for appellate review; the defendant must make a contemporaneous objection sufficient to preserve the issue for appeal. *Berry v. State,* 574 N.E.2d 960, 965 (Ind.Ct.App.1991), *trans. denied.* The failure to make such an objection waives any claim on appeal that the evidence was improperly admitted. *Brown v. State,* 783 N.E.2d 1121, 1126 (Ind.2003). Even a valid continuous objection to evidence ruled admissible at a suppression hearing is waived when counsel states "no objection" to such evidence at trial. *Hayworth v. State,* 904 N.E.2d 684, 693–94 (Ind.Ct.App. 2009).

Our examination of the trial transcript discloses that Scott's trial counsel did not make a continuing objection to the admission of the derringer, and she did not object to portions of Officer Amor's testimony about the derringer and the two bullets found inside the gun. (Tr. at 272–73; 287–80). When the State offered into evidence Exhibit 36, the derringer itself, trial counsel responded with "no objection," and counsel again stated "no objection" when the State offered Exhibits 39 and 40, the bullets found inside the gun. (Tr. 277; 280). In addition, trial counsel did not raise an objection when another officer, Officer Gard, testified about finding the derringer under the mattress. (Tr. 325). This issue has been waived.

Waiver notwithstanding, we conclude that Scott would not prevail if a timely objection had been made. Under the Fourth Amendment to the United States Constitution, police generally must obtain a search warrant from a neutral magistrate prior to searching a person or private property, subject to " 'certain carefully drawn and well-delineated exceptions.' " *Sellmer v. State,* 842 N.E.2d 358, 362 (Ind. 2006) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). Because warrantless searches are per se unreasonable, the State bears the burden of proving that a search falls within one of the well-delineated exceptions to the warrant requirement. *Johnson v. State,* 766 N.E.2d 426, 432 (Ind.Ct.App. 2002), *trans. denied.*

One of these well-recognized exceptions is a voluntary and knowing consent to a search. *Krise v. State,* 746 N.E.2d 957, 961 (Ind.2001). Here, Scott's argument regarding consent to the search that culminated in the discovery of the derringer is that the search went beyond his consent. Specifically, he argues that he consented to a search for individuals and that a search between the mattress and the box springs in the bedroom was not, in the mind of a reasonable person, a search for individuals.

The scope of a defendant's consent is measured by a standard of objective reasonableness—what a typical reasonable person would have understood by an exchange between the officer or officers and the person. *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). Here, the police officers making the search testified that they were aware from their training and experience that individuals sometimes hid in hollowed-out box springs. Generally speaking, a typical reasonable person would understand that police officers' knowledge of potential hiding places is based upon the officers' training and experience, and that consent would include use of that knowl-

edge. We can imagine limitations to an application to this approach. However, in this case, where the officers took only a couple of minutes to conduct the entire search, where the movement of the mattress caused no damage to Scott's property, and where the officers testified that they had previously found individuals hiding in hollowed out box springs, we conclude that Scott's consent to a search for persons extended to the movement of his mattress.

## B. THE ADMISSION TO THE PRESENCE OF BOTH WEAPONS

█ Scott also contends that the trial court abused its discretion by not excluding his admission to Detective Shumaker that the derringer was located under the mattress and that the nine-millimeter handgun was located under the couch. Essentially, he argues that his admission was an involuntary "consent" because a reasonable person would have believed he was in custody, thus invoking the requirement to give *Pirtle* and *Miranda* warnings.[1] Scott notes that in *Pirtle v. State,* 263 Ind. 16, 323 N.E.2d 634, 640 (1975), our supreme court held that a person in police custody who gave consent to search was entitled to the advice of counsel. He further notes that an appellate court determines whether a person is "in custody" by "applying an objective test asking whether a reasonable person under the same circumstances would believe that [he] was under arrest or not free to resist the entreaties of the police." *Sellmer v. State,* 842 N.E.2d at 363.

In his initial brief, Scott argues that he was in custody at the time he made his admission because he did not feel free to leave in the presence of six armed officers. In his reply brief, he expands his claim, stating that he was "surrounded by seven police officers, six of whom were in uniform and, two with shotguns across their chests." (Reply Brief at 6).

Our reading of the record shows that at the time of the admission, Scott knew of and observed the presence of two or three armed and uniformed officers and one plainclothes detective. Neither the officers nor the detective drew or pointed a weapon at Scott, and no one threatened him. Scott originally invited Detective Shumaker into his house before stepping outside at the detective's request. Scott had prior experience with law enforcement and the criminal justice system, and no one suggested that he had to consent to a search or answer Detective Shumaker's question about the presence of weapons. The encounter did not occur in an inherently coercive environment, and the entire encounter lasted approximately seventeen minutes. Thus, we conclude that the totality of the circumstances support the trial court's conclusion that the admission was voluntary and that Scott was not in custody. The trial court did not abuse its discretion in refusing to exclude the admission.

## II. JURY INSTRUCTION

█ Scott contends that the trial court erred in not giving his tendered jury instruction pertaining to the pointing a firearm charge. Specifically, Scott maintains that the trial court should have given a jury instruction informing the jury that it could find him guilty of a misdemeanor,

---

1. As noted above, Scott's "consent" argument regarding the search for the derringer was limited to the scope of his consent. In his reply brief, however, Scott applies "consent to search" cases to the facts of the instant case to show that his admission to the presence of both guns should have been excluded by the trial court.

instead of a D felony, if the derringer he pointed at Officer Cudworth was unloaded.

Jury instruction lies within the sole discretion of the trial court, and we review the trial court's instruction for an abuse of discretion. *Powell v. State*, 769 N.E.2d 1128, 1132 (Ind.2002). In reviewing a challenge to a jury instruction we consider, among other things, whether there is evidence in the record to support the giving of the instruction. *Hubbard v. State*, 742 N.E.2d 919, 921 (Ind.2001).

Ind.Code § 35–47–4–3(b) states that a person commits a Class D felony when the person "knowingly or intentionally points a firearm at another person." However, the offense is a Class A misdemeanor "if the firearm was not loaded." *Id.*

 The elements of Class D felony pointing a firearm "simply do not include a requirement that a gun be loaded." *Adkins v. State*, 887 N.E.2d 934, 937 (Ind. 2008). Indeed, "the statutory language indicates a clear intent that the State is not required to prove that a firearm was loaded in order to obtain a conviction for pointing a firearm as a Class D felony." *Id.* (quoting *Brown v. State*, 790 N.E.2d 1061, 1064 (Ind.Ct.App.2003)). The plain language of the statute "suggests that if the evidence is totally lacking with regard to whether a weapon is loaded or unloaded, a jury cannot convict of a Class A misdemeanor because the 'unloaded' element of the offense has not been established." *Id.* Thus, a defendant "is entitled [to be convicted] of a class A misdemeanor rather than a class D felony only if the evidence affirmatively demonstrates that the firearm was not loaded." *Id.* (citing *Brown*). If a defendant charged with Class D felony pointing a firearm seeks instead to be convicted of Class A misdemeanor pointing a firearm, "the defendant must place the fact of the gun having been unloaded at

issue if the State's evidence has not done so." *Id.* at 938.

Scott claims that the State placed the fact that the derringer was unloaded at issue when Officer Cudworth testified that Scott pulled the trigger on the firearm, it failed to discharge, and Scott's "eyes got real wide open, he was looking at the gun in his hand, and he ran away ... I believe he tried to shoot me [and] his gun malfunctioned." (Tr. 149–150). Scott further claims that Officer Amor also placed the fact at issue when he testified that later the same day he recovered the derringer, it was loaded with two bullets, and one bullet had an indentation on the primer from where it was struck with a firing pin, indicating that an attempt had been made to fire the gun but it had misfired. Scott places great emphasis on Officer Amor's testimony on cross-examination that because he was not at the scene when Scott confronted Officer Cudworth, he did not know whether Scott even had a gun at the scene or whether it was loaded at the time.

We conclude that Officer Amor's testimony did not place the question of whether the derringer was unloaded at issue. Officer Amor was not at the scene of the encounter between Scott and Officer Cudworth, and he had no knowledge of whether Scott even had a gun at the scene.

 However, the Class A misdemeanor is at issue if there is some evidence from which the jury can draw a conclusion that the weapon was unloaded. Indeed, the misdemeanor is at issue unless the evidence is "totally lacking with regard to whether [the] weapon is loaded or unloaded...." *Adkins*, 887 N.E.2d at 937. Although it is perhaps unlikely that the jury in the present case would have found that the derringer was unloaded, Officer Cudworth's testimony could support a reasonable inference to the contrary. Simply put, the question of whether the gun was

unloaded was at issue, and there was evidence to support the giving of Scott's tendered instruction. The trial court abused its discretion because it declined to give a tendered instruction that informed the jury of its options under the facts presented in Officer Cudworth's testimony. Thus, we must reverse and remand on this issue.

### III. EVIDENCE OF NOLO CONTENDERE PLEA

Scott contends that the trial court erred in admitting his *nolo contendere* plea to a Florida murder as proof that he was convicted of an offense that qualifies him as a serious violent felon under Ind.Code § 35–47–4–5(a). Scott claims that his Florida plea cannot be admitted under Indiana Rule of Evidence 803(22) which allows admission of evidence "of a final judgment entered after a trial or upon a plea of guilty (but not upon a plea of *nolo contendere*) adjudging a person guilty of a crime punishable by death or imprisonment in excess of one year." Scott further claims that because the plea cannot be admitted under Evid.R. 803(22), which specifically refers to *nolo contendere* pleas, it cannot be admitted under the more general hearsay exception set forth in Evid.R. 803(8). The public records exception of Evid.R. 803(8) provides that "records, reports, statements, or data compilations in any form" are admissible when the records come from "a public office or agency, setting forth its regularly conducted and regularly recorded activities, or matters observed pursuant to duty imposed by law and as to which there was a duty to report, or factual findings resulting from an investigation made pursuant to authority granted by law."

The *nolo contendere* plea is part of State's Exhibit 46, which includes a charging information, plea agreement, judgment, and sentencing order from the Florida Department of Correction. Included in the judgment is the statement that "the Defendant is hereby ADJUDICATED GUILTY of [murder in the second degree]." (Ex. 46). (Emphasis in original). Included in the sentencing order [2] is the statement that the trial court "adjudges you [Scott] guilty of [murder in the second degree]." (Ex. 46). The trial court entered a written order admitting the exhibit, stating:

> In this case, the evidence of the prior conviction is being offered as proof that the defendant was convicted of murder, not to prove the facts involved in the conduct which constituted murder. So defendant's objection, that the evidence is hearsay and that the conditions specified in the 803(22) exception have not been shown, is without merit. When used to prove only that the defendant was convicted of murder, the evidence is either not hearsay or is admissible under the public records exception. If the prior conviction were being offered in a civil case, for example, by the murder victim's family to recover damages in a wrongful death action, then 803(22) would have to be complied with if the conviction were to be considered proof of the fact that the defendant did kill the victim. Here, though, it is being offered only to prove that he was convicted of murder, so it is not the case in which 803(22) applies.

(Appellant's App. at 141).

As noted in our discussion of the first issue, a trial court's decision to admit or exclude evidence lies within the trial court's discretion. *See Trujillo v. State*, 806 N.E.2d 317, 323 (Ind.Ct.App.2004).

---

**2.** The sentencing order is entitled "Judgment, Sentence And Order Placing Defendant On Probation During Portion of Sentence." (Ex. 46).

We will reverse if the trial court abuses its discretion. *Id.* An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or where the court misinterprets the law. *Id.*

■ As the parties indicate in their respective briefs, there are no Indiana cases that govern in this case. Thus, the parties cite to state and federal cases that support their respective arguments, and it is our task to determine which cases we find most persuasive. After reviewing the cases cited and cases found in our research, we conclude that Evid.R. 803(22) is intended to prevent the *nolo contendere* conviction from being used in a subsequent proceeding to prove the defendant's actual guilt of that prior offense. The rule does not prevent the admission under Evid.R. 803(8) of a *nolo contendere* plea as a public record proving the fact of the conviction. *See United States v. Adedoyin,* 369 F.3d 337, 343–45 (3d Cir.2004), *cert. denied* 543 U.S. 915, 125 S.Ct. 131, 160 L.Ed.2d 198 (holding that certified copies of the defendant's prior conviction, which was the result of a *nolo contendere* plea, were admissible, notwithstanding Evid.R. 803(22), because the evidence was not offered for the purpose of proving that Adedoyin committed the crime, but was offered "solely for the purpose of showing that Adedoyin had a prior felony conviction")[3]; *State v. Samonte,* 83 Hawai'i 507, 928 P.2d 1, 29–32 (1996) (holding that Evid.R. 803(22) is not applicable because "proof of the previous conviction is at is-

sue rather than proof of the facts sustaining the previous conviction"); *Evans v. State,* 725 So.2d 613, 685 (Miss.1997), *cert. dismissed* 525 U.S. 1133, 119 S.Ct. 1097, 143 L.Ed.2d 34 (1999) (holding that Evid.R. 803(22) applies to evidence of a prior judgment offered to "prove any fact essential to sustain the judgment" and that instead of being offered to prove any fact essential to sustain the judgment, "the conviction was introduced by the State to prove the prior conviction"); *State v. Stone,* 122 Ariz. 304, 594 P.2d 558, 564 (Ariz.Ct.App.1979) (holding that Evid.R. 803(22) did not apply because the evidence of a no contest plea was offered to prove the fact of the prior conviction").

Scott cites *United States v. Willis,* 106 F.3d 966 (11th Cir.1997) and related cases for the proposition that a Florida *nolo contendere* plea does not result in a conviction. Thus, Scott reasons that no conviction has been shown to establish his serious violent offender status under Ind.Code § 35–47–4–5. We disagree. The *Willis* decision relies on the reasoning in *Garron v. State,* 528 So.2d 353, 360 (Fla.1988), which states that a Florida *nolo contendere* plea cannot be used as an aggravating circumstance because lack of an adjudication of guilt cannot result in a "conviction." The abrogation of this reasoning was recognized in *State v. Mason,* 979 So.2d 301 (Fla.App.2008) (holding that the Florida Supreme Court's holding in *Montgomery v. State,* 897 So.2d 1282, 1286 (Fla.2005), *Garron* and its progeny "are of questionable viability")[4]. Furthermore, as Exhibit

---

3. Scott attempts to distinguish *Adedoyin* by referring to the court's discussion of Federal Evidence Rule 410. We note that Adedoyin raised Federal Evidence Rule 803(22) on appeal, and the court held that "the same reasoning animates Rule 803(22) as Rule 410, that is, that pleas of nolo contendere and convictions on the basis of such pleas are not

admissible for purposes of proving that the defendant is guilty of the crime in question." 369 F.3d at 345. The court went on to hold that that the pleas are admissible to show that a defendant has a prior conviction. *Id.*

4. The *Montgomery* majority did not expressly mention *Garron,* but the case specifically

46 shows, Scott was adjudicated guilty by a Florida court of second-degree murder.

Finally, Scott argues that the State failed to show that the Florida statute defining second degree murder correlates with one of the offenses listed in Ind.Code § 35–47–4–5. Scott claims that the Florida statute could also reflect the lowered *mens rea* of Indiana's involuntary manslaughter statute.[5] Scott points out that involuntary manslaughter is not one of the serious violent felonies listed in Ind.Code § 35–47–4–5(b).

The State counters that Scott waived this issue because it failed to raise it below. *See Bryant v. State*, 802 N.E.2d 486, 496 (Ind.Ct.App.2004), *trans. denied* (holding that an issue cannot be raised for the first time on appeal). Our review of the transcript and Scott's silence in his reply brief reveals that the State is correct. The issue is waived.

Waiver notwithstanding, we note that in Florida second degree murder differs from first degree murder only in that it is not premeditated. *See* Fla. Stat. § 782.04(1). Florida has an entirely different statute for manslaughter. *See* Fla. Stat. § 782.07. Florida's second degree murder statute is not akin to our involuntary manslaughter statute.

Affirmed on issues I and III. Reversed and remanded for further proceedings on Issue II.[6]

BAKER, C.J., and NAJAM, J., concur.

holds that a no contest (nolo contendere) plea is a conviction.

**5.** Ind.Code § 35–42–1–4 states that a person commits involuntary manslaughter when he or she kills another human being while committing or attempting to commit designated offenses.

**6.** We note that Scott did not request review of his sentence.