## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 31 2018, 6:09 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Thomas F. Martin II
Thomas Martin Law, L.L.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Chase Edward Mourey, Jr., <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | August 31, 2018 <br><br> Court of Appeals Case No. <br> 18A-CR-328 <br><br> Appeal from the <br> Hamilton Circuit Court <br><br> The Honorable <br> Paul A. Felix, Judge <br><br> Trial Court Cause No. <br> 29C01-1704-F2-2390 |

**Kirsch, Judge.**

Following a jury trial, Chase Edward Mourey, Jr. ("Mourey") was convicted of dealing in methamphetamine[1] as a Level 2 felony and driving while suspended,[2] a Class A misdemeanor, and he was found to be an habitual offender.[3] The trial court sentenced Mourey to twenty years for dealing methamphetamine, enhanced by ten years for the habitual offender finding. Of that time, the trial court ordered twenty-two years executed and suspended eight years. The trial court also ordered Mourey to serve a concurrent one-year sentence for driving while suspended. On appeal, Mourey raises the following restated issues:

> I. Whether the trial court abused its discretion by admitting into evidence the methamphetamine found in the vehicle that Mourey claims was searched in violation of the Fourth Amendment to the United States Constitution and Article I, section 11 of the Indiana Constitution;

> II. Whether the trial court abused its discretion by denying Mourey's third and fourth motions for a continuance, which he claims denied him his right to counsel under the Sixth Amendment to the United States Constitution; and

> III. Whether the trial court abused its discretion during sentencing by commenting on and rejecting Mourey's trial defense and by aggravating his sentence using Mourey's criminal

---

[1] *See* Ind. Code § 35-48-4-1.1(a)(2), (e)(1).

[2] *See* Ind. Code § 9-24-19-2.

[3] *See* Ind. Code § 35-50-2-8.

history, which also formed the basis for the habitual offender enhancement.

[2] We affirm.

## Facts and Procedural History

[3] On March 31, 2017, around 11:40 a.m., Fishers Police Sergeant Thomas Greg Weesner ("Sergeant Weesner") observed a man, later identified as Mourey, driving a black Dodge southbound on North by Northeast Boulevard in Hamilton County. Sergeant Weesner checked the vehicle's license plate and discovered that the registered owner, Holly Rairdon ("Holly"),[4] had a suspended driver's license. Sergeant Weesner also found "an associate" of Holly's, named Joe Mourey ("Joe"), who had a suspended driver's license; Joe was Mourey's brother and Holly's ex-husband. *Tr. Vol. 2* at 146, 154. Looking at Joe's Bureau of Motor Vehicles photograph, Sergeant Weesner believed that Joe was the driver of the Dodge. Sergeant Weesner watched the Dodge as it crossed an overpass, turned, and pulled into the parking lot of a Village Pantry/Marathon gas station.

[4] Soon thereafter, Sergeant Weesner entered the parking lot and saw Mourey heading toward the convenience store. Sergeant Weesner noted that Mourey was looking at him as Mourey entered the store, exited the store, and walked to the gas pumps. Mourey pumped gas for about thirty seconds and then drove to

---

[4] The record reflects that Holly is also spelled as "Holli." *Appellant's App. Vol. II* at 75, 84.

the station's air pumps where he got out of the Dodge and returned to the store while watching Sergeant Weesner. Sergeant Weesner was suspicious of Mourey's actions, so he activated his in-car camera, drove across the parking lot, and parked behind the Dodge. Sergeant Weesner did not activate his lights or siren.

[5] While Mourey was still outside of his car, Sergeant Weesner approached him on foot and said, "[H]ow's it going bud." *State's Ex. 1A* at 11:46:53-58.[5] In response to Sergeant Weesner's question, Mourey said the car belonged to Holly,[6] and he explained he was in the area to meet someone. Sergeant Weesner assured Mourey that he was not in trouble and asked for his identification. Mourey looked through his wallet and told Sergeant Weesner that he must have left the wallet with his ID at home. *Id*. at 11:47:10-15. Mourey provided Sergeant Weesner with his name and birth date, and the officer returned to his squad car to verify the information, while Mourey continued putting air in his tires. *Id*. at 11:47:15-40.

[6] Unable to find Mourey in the database, Sergeant Weesner returned to Mourey and asked for his Social Security number ("SSN"). *Id*. at 11:48:05-18. Sergeant Weesner also asked Mourey if he had a valid driver's license, and Mourey

---

[5] The in-car recording reflects that Sergeant Weesner first spoke with Mourey at 11:46:53 a.m. *State's Ex.1A*. While the in-car recording reflects both the time of day and the time that has passed since the recording began, the parties cite to the time of day. We will do the same.

[6] Mourey actually stated that the car belonged to his sister, but it was soon clarified that the car belonged to his sister-in-law (Joe's ex-wife), Holly. *Tr. Vol. 2* at 165.

admitted that he did not. Mourey admitted that he was driving on a suspended license. *Id*. at 11:48:50-11:49:00. When Sergeant Weesner asked Mourey if he had any weapons on him, Mourey said he did not and agreed to a pat-down search. Sergeant Weesner reminded Mourey that he could not drive the Dodge without a license and escorted him to the passenger side of the squad car. *Tr. Vol. 2* at 162; *State's Ex. 1A* at 11:49:03-24. Investigating the offense of driving while suspended, Sergeant Weesner searched for Mourey in the database, again without success. Asking for more clarification, Sergeant Weesner had Mourey sit in the passenger seat to provide his SSN, which Mourey did. With this information, Sergeant Weesner confirmed that Mourey's license was "suspended with prior," which was a Class A misdemeanor. *Tr. Vol. 2* at 21, 164. Mourey, still appearing nervous, told the officer that he was worried about the offense of driving on a suspended license, and Sergeant Weesner told him not to worry. When Sergeant Weesner asked if there was anyone nearby who could pick up the car, Mourey said that someone could get the car in about a half hour. *State's Ex. 1A* 11:51:21-28.

[7] Sergeant Weesner continued to talk with Mourey and could see that he was breathing heavily and that his "carotid artery was pulsating." *Tr. Vol. 2* at 165. Sergeant Weesner thought "[Mourey] was still very, very nervous about the encounter." *Id*. He told Mourey that he was being detained for his driving with a suspended license and read him his *Miranda* rights and his *Pyrtle* warnings. *State's Ex. 1A* at 11:53:00-11:55:21. Sergeant Weesner placed Mourey in handcuffs, explaining that he was being detained for driving with a suspended

license, that Mourey had "been acting kinda weird" and "moving around a bunch," and that the officer wanted to make sure that "mental-state-wise [Mourey was] okay." *Id.* at 11:55:00-30. Sergeant Weesner said he needed to both investigate Mourey's offense of driving while suspended and determine whether the Dodge had insurance so that someone could drive it home. Since the Dodge belonged to Holly, Mourey had no proof of insurance.

[8] Sergeant Weesner told Mourey that he was going to have a K-9 "take a quick walk around the car," and if there was a "hit," the police would search the car. *Id.* at 11:55:32-48. Sergeant Weesner explained that, if the K-9 did not alert and no search was necessary, someone could pick up the car with proof of insurance. Otherwise, the police would have to tow the car. Upon further investigation, Sergeant Weesner discovered that Mourey's driver's license had been suspended since 2002. *Tr. Vol. 2* at 163-64.

[9] Sergeant Weesner made several phone calls, trying to confirm that the Dodge was insured. At one point, he was able to reach Mourey's mother, who said she did not know if the car was insured, nor did she know Holly's phone number. *State's Ex. 1*A at 12:15:52-12:17:07. The Indiana State Police K-9 Unit arrived and did a "walk around" the Dodge. *Tr. Vol. 2* at 170. Meanwhile, Mourey's mother called back and provided Sergeant Weesner with the insurance information for the Dodge. *State's Ex. 1A* at 12:21:00-12-23:07. By this time, the K-9 had already alerted to the rear wheel on the driver side and to the air pump, two places that Mourey had touched while putting air in the tires. *Tr. Vol. 1A* at 112, 170, 211, 214-15; *State's Ex. 1A* at 12:19:00-12:21:14.

[10] Prompted by the K-9 alert, Sergeant Weesner searched the Dodge and found inside the Dodge's center console two, clear, plastic baggies containing 10.36 grams of a crystal rock-like substance. *Tr. Vol. 2* at 172. The substance subsequently tested positive for methamphetamine. *Id*. at 236. In the glove compartment, Sergeant Weesner found two counterfeit twenty-dollar bills. *Id*. at 175-76. Mourey had $700 in cash on his person. *State's Ex. 1A* at 11:56:00-10. Based on the objects found during the search, Sergeant Weesner arrested Mourey, confiscated his cash and cell phone, and, later, obtained a warrant to search the contents of the cell phone. *Tr. Vol. 2* at 177.

[11] Text messages found on Mourey's phone included messages sent to Mourey by someone looking to purchase a "teen or two," and another person seeking to purchase "Probably 2 8s." *State's Exs*. 7, 10. The texts reflected discussions regarding prices of drugs and a complaint about the quality of "leftovers" being "half chunky & half flakes." *Id*. at 11. A police officer, who specialized in narcotics, identified these as drug terms. *Tr. Vol. 2* at 243-50. On April 3, 2017, the State charged Mourey with dealing in methamphetamine as a Level 2 felony, counterfeiting as a Level 6 felony, driving while suspended as a Class A misdemeanor, and being an habitual offender.

[12] The trial court appointed Steven Holt ("appointed counsel") as pauper counsel, and the jury trial was set for July 10, 2017. The trial court granted Mourey's first two motions for continuance, which resulted in a trial date of December 4, 2017. Meanwhile, Mourey hired private counsel, Jonathan D. Harwell ("retained counsel"), who entered his appearance with the trial court on

November 6, 2017. *Appellant's App. Vol. II* at 52. On November 17, 2017, less than three weeks before trial, retained counsel filed Mourey's third motion for continuance, in which he stated: (1) he had recently been retained; (2) the State had no objection to the continuance; (3) the motion was not made for delay, and a continuance would not prejudice the State; (4) he had not sought a previous continuance; and (5) he would be unavailable during most of November 2017 through February of 2018, due to scheduled trials, depositions, and hearings. *Id*. at 53. That same day, the trial court denied Mourey's request for a continuance. Three days later, on November 20, 2017, retained counsel filed Mourey's fourth motion for a continuance—captioned, "Renewed Motion for Continuance—stating, "If Counsel were required to proceed on the days in question[], Counsel is not prepared and would be unable to provide effective assistance of counsel and would request his appearance be withdrawn." *Id*. at 57. On November 21, 2017, the trial court denied Mourey's motion, explaining: (1) the case had been pending for seven months; (2) Steve Holt had been Mourey's appointed counsel during the pendency of the matter; and (3) Mourey had requested and received two continuances. *Id*. at 59. The trial court stated that the decision to hire private counsel with less than four weeks to trial was Mourey's to make, but it was the trial court's decision to keep the case set for a December trial date. *Id*.

[13] On November 21, 2017, appointed counsel filed a motion to withdraw as Mourey's counsel, citing that Mourey had retained other counsel. *Id*. at 60. That same day, retained counsel filed an emergency motion to withdraw,

stating it was in Mourey's best interest that he withdraw because retained counsel could not provide effective assistance on such short notice. *Id*. at 62. The trial court granted retained counsel's motion but denied appointed counsel's motion to withdraw. On November 27, 2017, appointed counsel filed a final motion to continue,[7] which the trial court again denied.

[14] On December 1, 2017, Mourey filed a motion to suppress the evidence of the methamphetamine found during the search; the trial court denied the motion. A bifurcated trial was held from December 4 through December 6, 2017, during which Mourey neither objected to testimony regarding the methamphetamine nor to the admission of State's Exhibit 2, the drugs found in the Dodge. *Tr. Vol. 2* at 173, 232-34, 235-36. Also without objection, the State presented evidence of the incriminating text messages found on Mourey's cell phone. Mourey's theory at trial was that someone else had put the drugs in the car. The jury acquitted Mourey of counterfeiting but found him guilty of the remaining charges and adjudged him to be an habitual offender.

[15] During the sentencing hearing, Holly, who had been unable to testify at trial, said that she allowed others to borrow the Dodge, that she had loaned the car to her cousin the day before Mourey used it, and that the methamphetamine may

---

[7] In his brief, Mourey contends, "The trial court's denial of two motions to continue the trial date *which were filed by private counsel, Jonathan Harwell* . . . , was unreasonable under the circumstances and denied Mourey his right to retain counsel of his choosing." *Appellant's Br*. at 24. Mourey does not cite to the motions filed by appointed counsel; accordingly, Mourey is not appealing the denial of this November 27, 2017 motion for a continuance.

have belonged not to Mourey, but to someone else. *Tr. Vol. 3* at 154-56. As part of the sentencing statement, the trial court expressed frustration with Mourey's continued insistence that someone else placed the drugs in the car and said, "You continued this feigned defense with your presentation of evidence today . . . ." *Id*. at 181. The trial court noted that Mourey was caring, hardworking, dependable, and affectionate, especially to his wife. However, the court recognized that Mourey had a "horrible criminal history," with offenses and convictions that dated back "for two decades or more," and that Mourey was serving a community corrections sentence when the instant offense occurred. *Id*. at 182-83. The trial judge also noted that Mourey did not keep his promise to stay out of trouble when he relapsed into drug use and "helped other people relapse who may have been trying to abstain." *Id*. at 183.

[16] The trial court sentenced Mourey to twenty years for dealing methamphetamine, enhanced by ten years for the habitual offender finding. Of that time, the trial court ordered twenty-two years executed—twenty years in the Department of Correction and two years as direct commitment to work release—and suspended eight years. The trial court also ordered Mourey to serve a concurrent one-year sentence for driving while suspended and imposed a two-year term of probation. Mourey now appeals. Additional facts are included as needed.

# Discussion and Decision

## I. Admission of Evidence

[17] Mourey contends that the trial court abused its discretion by admitting into evidence the drugs that were discovered during a search that he claims violated his rights under Article I, section 11 of the Indiana Constitution and the Fourth Amendment to the United States Constitution. Mourey initially challenged the admission of this evidence through a motion to suppress; he did not seek interlocutory review of the denial of his motion to suppress and appeals following a completed trial. Thus, the issue is appropriately framed as whether the trial court abused its discretion by admitting the evidence at trial. *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014).

[18] In ruling on admissibility following the denial of a motion to suppress, the trial court considers the "evidence from the suppression hearing that is favorable to the defendant only to the extent it is uncontradicted at trial." *Id*. We do not reweigh the evidence but defer to the trial court's factual determinations unless clearly erroneous. *Weathers v. State*, 61 N.E.3d 279, 284 (Ind. Ct. App. 2016). "Because the trial court is best able to weigh the evidence and assess witness credibility, we review its rulings on admissibility for abuse of discretion and reverse only if a ruling is 'clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights.'" *Carpenter*, 18 N.E.3d at 1001 (quoting *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013)). However, "'the ultimate determination of the constitutionality of a search or seizure is a question of law that we consider de novo.'" *Barker v. State*, 96

N.E.3d 638, 646 (Ind. Ct. App. 2018) (quoting *Carpenter*, 18 N.E.3d at 1001),

*trans. denied*.

### *A. Article I, Section 11*

On appeal, Mourey claims, in part, that Sergeant Weesner's search violated his rights under Article I, section 11 of the Indiana Constitution. "To determine whether a search violated the Indiana Constitution, this court must evaluate the reasonableness of the police conduct under the totality of the circumstances." *Chest v. State*, 922 N.E.2d 621, 624 (Ind. Ct. App. 2009). In his motion to suppress, Mourey cited to *Rodriguez v. United States*, 135 S. Ct. 1609, 1612-13 (2015) and *Bush v. State*, 925 N.E.2d 787, 789 (Ind. Ct. App. 2010), as support for his claim. *Appellant's App. Vol. II* at 80, 84. The analysis in those cases was based solely on an interpretation of the Fourth Amendment.

> "[A] trial court cannot be found to have erred as to an issue or argument that it never had an opportunity to consider. Accordingly, as a general rule, a party may not present an argument or issue on appeal unless the party raised that argument or issue before the trial court. In such circumstances the argument is waived."

*Leatherman v. State*, 101 N.E.3d 879, 885 (Ind. Ct. App. 2018) (quoting *Washington v. State*, 808 N.E.2d 617, 625 (Ind. 2004)) (citation omitted). Mourey did not argue in his motion to suppress or to the trial court during the suppression hearing that the search violated the Indiana Constitution. Accordingly, that issue is waived.

[20] Mourey attempts to avoid waiver by arguing that the trial court's denial of his motion under Article I, section 11 constituted fundamental error. Specifically, he contends that "the right [to exclude illegally seized evidence] is so essential to society-at-large and to criminal procedure that its violation should be reviewed under the rubric of fundamental error." *Appellant's Reply Br.* at 4. However, Mourey's first mention of fundamental error occurs in his reply brief. Our Supreme Court has held that where, as here, a party does "not allege fundamental error in his principal appellate brief but, instead, raises it for the first time in his reply brief," consideration of that claim is waived. *See Bowman v. State*, 51 N.E.3d 1174, 1179-80 (Ind. 2016) (claim of fundamental error was waived when appellant failed to raise issue of fundamental error in his initial appellate brief). Because Mourey did not preserve a claim that the search violated his rights under the Indiana Constitution, that issue is waived.

### B. Fourth Amendment

[21] On appeal, Mourey also claims that Sergeant Weesner's search violated his rights under the Fourth Amendment to the United States Constitution. Specifically, he contends that the evidence was obtained through an unlawful detention and the subsequent search of the vehicle was tainted. As such, the evidence should have been excluded. The State contends that Mourey's Fourth Amendment claim is waived because, although Mourey filed a motion to suppress the methamphetamine, he did not make a timely objection when that evidence was admitted at trial. "A pre-trial motion to suppress does not preserve an error for appellate review; the defendant must make a

contemporaneous objection sufficient to preserve the issue for appeal." *Scott v. State*, 924 N.E.2d 169, 174 (Ind. Ct. App. 2010), *trans. denied, cert. denied*, 562 U.S. 1152 (2011). The failure to make such an objection waives any claim on appeal that the evidence was improperly admitted.[8] *Id*. (citing *Brown v. State*, 783 N.E.2d 1121, 1126 (Ind. 2003)).

[22] Our review of the trial transcript reveals that appointed counsel did not object either to Sergeant Weesner's testimony describing the discovery of the methamphetamine inside the Dodge or to the introduction of that evidence. *Tr. Vol. 2* at 172. In fact, when, on the second day of trial, the State offered the drugs into evidence as State's Exhibit 2, appointed counsel said, "No objection." *Id*. at 236. Accordingly, Mourey has waived his Fourth Amendment claim.

[23] Attempting to avoid waiver, Mourey argues that our court may still review his Fourth Amendment challenge under the doctrine of fundamental error. However, like the analysis of fundamental error under the Indiana Constitution, Mourey raises this Fourth Amendment claim for the first time in his reply brief. *Appellant's Reply Br*. at 7. Where, as here, a party does not allege fundamental error in his principal appellate brief but, instead, raises it for the first time in his reply brief, consideration of that claim is waived. *See Bowman*,

---

[8] "Even a valid contin[uing] objection to evidence ruled admissible at a suppression hearing is waived when counsel states 'No objection,' to such evidence at trial." *Scott v. State*, 924 N.E.2d 169, 174 (Ind. Ct. App. 2010), *trans. denied*, *cert. denied*, 562 U.S. 1152 (2011).

51 N.E.3d at 1179. Thus, Mourey has failed to preserve a claim that the trial court's admission of the evidence constituted fundamental error under the Fourth Amendment.

[24] Waiver notwithstanding, we find no merit to Mourey's claim that his detention and the search were in violation of Mourey's Fourth Amendment rights. The Fourth Amendment guarantees the right of individuals to be free from unreasonable searches and seizures by government officials. U.S. Const. Art. IV. The protections afforded under the Fourth Amendment however do not extend to a consensual encounter between an officer and a citizen. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). A consensual encounter is one in which a reasonable person would feel that he is free to "disregard the police and go about his business." *Id*. (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). A consensual encounter evolves into a seizure of the person when the officer uses force or a show of authority to restrain the freedom of movement of the individual. *Id*.

[25] On March 31, 2017, Sergeant Weesner saw Mourey drive the Dodge into the Village Pantry parking lot. Sergeant Weesner watched as Mourey entered and exited the convenience store, pumped gas for about thirty seconds, and drove to the station's air pumps. Mourey was putting air in his tires when Sergeant Weesner drove across the parking lot and parked behind him. Sergeant Weesner did not block Mourey's exit, later saying that he "was trying to conduct a consensual encounter. That way if the subject decided to leave, he was free to leave." *Tr. Vol. 2* at 160. Sergeant Weesner did not activate his

lights or siren. The in-car-video shows that Sergeant Weesner approached Mourey at 11:47 a.m. and, in a friendly manner, said, "[H]ow's it going bud." *State's Ex. 1A* at 11:46:53-58. Sergeant Weesner assured Mourey that he was not in trouble and asked for his identification. Mourey looked through his wallet and told Sergeant Weesner that he must have left the wallet with his ID in it at home. *State's Ex. 1A* at 11:47:10-15. Mourey then provided his name and birth date, and Sergeant Weesner returned to his squad car to verify the information. *Id.* at 11:47:15-40. Mourey continued to put air in his tires.

[26] Unable to find Mourey in the database, Sergeant Weesner exited his squad car and obtained Mourey's SSN. *Id.* at 11:48:05-18. At 11:48 a.m., less than two minutes after the initial encounter, Mourey told Sergeant Weesner that he did not have a valid driver's license. One minute later, Mourey admitted that he was driving on a suspended license, which, as a Class A misdemeanor, subjected him to arrest. *Id.* at 11:48:50-11:49:00. Here, the trial court properly found that when Mourey admitted to committing a crime—driving while suspended—he was still talking to Sergeant Weesner during a consensual encounter. *Tr. Vol. 2* at 120-22.

[27] Because Mourey could not drive the Dodge without a license, Sergeant Weesner escorted him to the passenger side of the squad car where Mourey stood outside with a second officer. *Id.* at 162; *State's Ex. 1A* at 11:49:03-24. After learning that Mourey's license was "suspended with prior" since 2002, Sergeant Weesner told Mourey that he was being detained for his driving with a suspended license, read him his *Miranda* rights and his *Pyrtle* warnings, and

placed Mourey in handcuffs. *Id.* at 11:55:00-30. Sergeant Weesner told Mourey that he was going to have a K-9 "take a quick walk around the car," and if there was a "hit," the police would search the car. *Id*. at 11:55:32-48. Sergeant Weesner said that, if the K-9 did not alert and no search was necessary, someone could pick up the car with proof of insurance. Mourey explained that, because the Dodge belonged to Holly, he did not have the proof of insurance. *Id.* at 11:51:44-51.

[28]     "[A] dog sniff is not a search protected by the Fourth Amendment. *Curry v. State*, 90 N.E.3d 677, 684 (Ind. Ct. App. 2017) (citing *State v. Hobbs*, 933 N.E.2d 1281, 1286 (Ind. 2010)), *trans. denied* (2018). "Therefore, 'no degree of suspicion is required to summon the canine unit to the scene to conduct an exterior sniff of the car or to conduct the sniff itself.'" *Id*. (quoting *Hobbs*, 933 N.E.2d at 1286). However, a "narcotics dog sweep 'is an unreasonable investigatory detention if the motorist is held for longer than necessary to complete the officer's work related to the traffic violation and the officer lacks reasonable suspicion that the motorist is engaged in criminal activity.'" *Id*. (quoting *Austin v. State*, 997 N.E.2d 1027, 1034 (Ind. 2013)).

[29]     Here, Sergeant Weesner's initial encounter with Mourey, which began at 11:47 a.m. on March 31, 2017, was consensual. Sergeant Weesner approached Mourey, asking how he was doing and asked for his identification, which was not a seizure. *See INS v. Delgado*, 466 U.S. 210, 216 (1984) (officer's request to see identification does not in itself result in a seizure unless officer's conduct is intimidating or gives the impression that compliance is required). One minute

into the encounter, Mourey told Sergeant Weesner that he did not have a valid driver's license. Almost two minutes into the encounter, Mourey admitted that he was driving on a suspended license, which, as a Class A misdemeanor, subjected him to arrest. *State's Ex. 1A* at 11:48:50-11:49:00; *see Garcia v. State*, 47 N.E.3d 1196, 1201 (Ind. 2016) (defendant was lawfully placed under arrest for driving his vehicle without a valid driver's license). The encounter with Sergeant Weesner was consensual for the first few minutes until the officer discovered that Mourey was driving on a suspended license. About seven minutes into the encounter, Sergeant Weesner placed Mourey in handcuffs while he continued to investigate the offense of driving while suspended. At that time, Sergeant Weesner informed Mourey that there would be a K-9 search. The K-9 arrived at the scene at 12:17 p.m. and alerted to the drugs in the car between 12:19 and 12:21 p.m. At this time, Sergeant Weesner's investigation was still ongoing because he did not learn until 12:23 p.m. whether the Dodge was insured. Mourey's rights under the Fourth Amendment were not violated.

## II.  Motions for Continuance

[30]   Mourey next contends that the trial court abused its discretion when it denied his third and fourth motions for a continuance, both of which retained counsel filed less than three weeks prior to trial. The denial of a non-statutory request

for a continuance is committed to the trial court's discretion.[9] *Schmid v. State*, 804 N.E.2d 174, 177 (Ind. Ct. App. 2004), *trans. denied*. An abuse of discretion occurs when the ruling is against the logic and effect of facts and circumstances before the court. *Tharpe v. State*, 955 N.E.2d 836, 843 (Ind. Ct. App. 2011), *trans. denied*. Under this standard, this court will only consider the evidence favorable to the trial court's ruling and the reasonable inferences to be drawn therefrom. *Kelley v. State*, 825 N.E.2d 420, 424 (Ind. Ct. App. 2005).

[31] "Continuances to allow more time for preparation are generally disfavored in criminal cases." *Id.*; *see Gibson v. State*, 43 N.E.3d 231, 235-36 (Ind. 2015) (trial courts are generally "reluctant to grant continuances in criminal cases merely to allow for additional preparation"). "The appellant must overcome a strong presumption that the trial court properly exercised its discretion. *Evans v. State*, 855 N.E.2d 378, 386 (Ind. Ct. App. 2006), *trans. denied*. "Additionally, the defendant must make a specific showing of how he was prejudiced as a result of the trial court's denial of his motion." *Id.* at 386-87.

[32] Here, Mourey's main claim on appeal is that denial of retained counsel's two continuances, filed on November 17, 2017 and November 20, 2017, resulted in a violation of his Sixth Amendment right to counsel of choice. *Appellant Br.* at

---

[9] A "defendant is statutorily entitled to a continuance where there is an 'absence of material evidence, absence of a material witness, or illness of the defendant, and the specially enumerated statutory criteria are satisfied.'" *Gibson v. State*, 43 N.E.3d 231, 236 (Ind. 2015) (quoting *Elmore v. State*, 657 N.E.2d 1216, 1218 (Ind. 1995) (citing Ind. Code § 35-36-7-1)). Here, Mourey makes no claim that he was statutorily entitled to a continuance.

24-25. This claim, however, is waived because Mourey never raised this basis for a continuance to the trial court. *Appellant's App. Vol. II* at 53-54, 57-58. While retained counsel argued that he intended to withdraw if the continuance was not granted, he did not mention the Sixth Amendment or suggest a denial of Mourey's right to counsel of choice. *Id.* at 57-58. Generally, an argument raised for the first time on appeal is waived and, therefore, will not be considered. *Washington*, 808 N.E.2d at 625 (defendant must object to alleged error to preserve issue for appeal; issues raised for first time on appeal are waived).

[33] Waiver notwithstanding, "[t]he Sixth Amendment guarantees a criminal defendant's right 'to have the Assistance of Counsel for his defen[s]e.'" *Washington v. State*, 902 N.E.2d 280, 286 (Ind. Ct. App. 2009) (quoting U.S. Const., amend. VI), *trans. denied*. "A corollary of this right is the right to choose counsel when a defendant is financially able to do so, and a defendant should be afforded a fair opportunity to secure counsel of his own choice." *Id.* "The right to privately retain counsel of choice derives from a defendant's right to determine the type of defense he wishes to present." *Id.* "'In criminal cases, the right to retain counsel of choice becomes a question of fundamental fairness, the denial of which may rise to a level of constitutional violation.'" *Id.* (quoting *Barham v. State*, 641 N.E.2d 79, 82 (Ind. Ct. App. 1994)). "A conviction attained when a court 'unreasonably or arbitrarily interferes with an accused['s] right to retain counsel of his choice . . . cannot stand, irrespective of whether the defendant has been prejudiced.'" *Id.* at 286-87 (internal quotation marks

omitted). "However, the right to counsel of choice is not absolute." *Lewis v. State*, 730 N.E.2d 686, 689 (Ind. 2000). It is well-settled "that the right to counsel of choice must be exercised at 'the appropriate stage of the proceedings.'" *Washington*, 902 N.E.2d at 287 (quoting *Lewis*, 730 N.E.2d at 689). Furthermore, the right to counsel of choice cannot be insisted upon to the exclusion of all other interests; instead, it must be balanced against the public's strong interest in the prompt, effective, and efficient administration of justice. *Smith v. State*, 452 N.E.2d 160, 163 (Ind. Ct. App. 1983).

[34] Here, the State charged Mourey with the instant offenses on April 3, 2017. Thereafter, the trial court named Steven Holt as appointed counsel, and a jury trial was set for July 10, 2017. On June 15, 2017, the trial court granted appointed counsel's first motion to continue and reset the trial for October 2, 2017. *Appellant's App. Vol. II* at 49. On Thursday, September 28, 2017, two days before the scheduled trial date, the trial court granted appointed counsel's second motion to continue and reset the trial for December 4, 2017. *Id.* at 51. In November 2017, Mourey retained private counsel, Jonathan Harwell, who entered his appearance with the trial court on November 6, 2017. *Id.* at 52. On November 17, 2017, less than three weeks before trial, retained counsel filed Mourey's third motion for continuance, saying that he had been recently retained and that the State had no objection to a continuance and would not be prejudiced by the delay. That same day, the trial court denied Mourey's request for a continuance.

[35] Three days later, retained counsel renewed his motion, Mourey's fourth motion for a continuance, stating, "If Counsel were required to proceed on the days in question[], Counsel is not prepared and would be unable to provide effective assistance of counsel and would request his appearance be withdrawn." *Id*. at 57. Retained counsel reiterated that he would be unavailable for trial until around March 2018. In a November 21 order, the trial court denied Mourey's motion, explaining that the case had been pending for seven months, that Holt had been Mourey's appointed counsel throughout the pendency of the matter, and that Mourey's "decision to hire private counsel with less than 4 weeks to the trial date is his to make." *Id*. at 59. The trial court made clear, however, that it was the trial court's decision to keep the December 4 trial date. *Id*. at 59.

[36] Motions to continue "sought shortly before trial to hire a new attorney are disfavored because they cause substantial loss of time for jurors, lawyers, and the court." *See Lewis*, 730 N.E.2d at 689. While retained counsel's motions to continue were not made immediately prior to trial, it is significant that: (1) Mourey's third and fourth motions were made less than three weeks prior to trial; (2) the trial court had granted two prior continuances; (3) Mourey's trial had already been continued for five months; (4) Mourey's criminal charges did not involve complicated facts or theories; (5) Holt was counsel throughout the entire matter; and (6) retained counsel had almost no availability until March 2018, three months hence. Under these facts, it was well within the trial court's discretion to deny Mourey's motions to continue. *See Schmid*, 804 N.E.2d at 178 (trial court did not abuse its discretion when it denied a motion for

continuance in a murder case because the case "had been pending for quite some time" and two months was "adequate time [for counsel] to prepare").[10]

# III. Sentencing

[37] Mourey argues that the trial court abused its discretion during sentencing when it: (1) commented on Holly's testimony; and (2) considered Mourey's criminal history to both aggravate his sentence and to support an habitual offender enhancement. *Appellant's Br.* at 27-29.

> A trial court abuses its discretion during sentencing by: (1) failing to enter a sentencing statement at all; (2) entering a sentencing statement that includes aggravating and mitigating factors that are unsupported by the record; (3) entering a sentencing statement that omits reasons that are clearly supported by the record; or (4) entering a sentencing statement that includes reasons that are improper as a matter of law.

*Howell v. State*, 97 N.E.3d 253, 270 (Ind. Ct. App. 2018) (citing *Anglemyer v. State*, 868 N.E.2d 482, 490-91 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218)), *trans. denied*.

[38] Mourey first argues that the trial court abused its discretion when, during the sentencing statement, it said that Holly's testimony—that the methamphetamine may have belonged to someone else—was a reiteration of a "feigned defense" used at trial. *Tr. Vol. 3* at 181. Mourey claims that this

---

[10] We note that Mourey was acquitted of the counterfeiting charge. As such, it is unlikely that Mourey could have succeeded on a claim that he was denied the right to counsel under the Sixth Amendment.

comment denied him his right to present a defense at trial and that such comment would have a chilling effect on future defendants, who have a constitutional right to present evidence on their own behalf. *Appellant's Br*. at 28. We disagree. While the trial court stated that it was convinced that the drugs in the car belonged to Mourey, the court did not make that statement to the jury. *Tr. Vol. 3* at 181-82. Mourey was not prevented from arguing to the jury his defense that the drugs belonged to another who borrowed the car. In fact, during voir dire, the potential jurors were asked whether they had borrowed or loaned a car and whether it would be reasonable to open a console or glove box in a car they had borrowed, and Sergeant Weesner testified that Holly's car was a "community car" that was borrowed by others. *See Tr. Vol. 2* at 70, 72, 200. The trial court's comment during sentencing had no impact on the verdict and did not deny Mourey his right to present his defense, as he claims. We find no error.

[39] Mourey also contends that the trial court abused its discretion when it used his criminal history: (1) to justify elevating his sentence for Level 2 felony dealing in methamphetamine from the advisory of seventeen and a half years to twenty years;[11] and (2) to support the habitual offender finding and its resultant ten-year enhancement. He argues that the trial court's statement that he has "a horrible criminal history here with offenses that date back and convictions that date back for two decades or more," lacked the specificity necessary to determine

---

[11] The advisory sentence for a Level 2 felony is seventeen and a half years. Ind. Code § 35-50-2-4.5.

whether the trial court was using the same convictions twice. *Appellant's Br*. at 29 (citing *Tr. Vol. 3* at 182). Again, we find no merit.

[40] A person convicted of a Level 2 felony is subject to a fixed term of imprisonment between ten and thirty years. Ind. Code § 35-50-2-4.5. At sentencing, the trial court informed Mourey that his sentence would be based on "both the offense that occurred as well as the person who committed the crime." *Tr. Vol. 3* at 180. The trial court set forth as mitigating factors that Mourey was hard working, caring, dependable, affectionate, and a good husband. *Id*. at 182. The trial court, however, weighed those factors against the aggravating factors that Mourey: had "negatively affected" his children's lives by providing them with and helping them buy illegal drugs; had a "horrible criminal history"; was "on probation or serving a Community Corrections sentence" when the instant offenses were committed; and had "fallen off the wagon" and was abusing drugs at the time of the instant offenses. *Id*. at 182, 183, 185. The trial court also noted that Mourey enabled some people to remain addicted to drugs and "helped other people relapse who may have been trying to abstain." *Id*. at 183. The trial court imposed a sentence for Mourey's Level 2 felony conviction that was within the fixed range. In fact, Mourey's twenty-year sentence was only two-and-a-half years greater than the advisory sentence. Even if the trial court had improperly used Mourey's criminal history twice, "[o]ne valid aggravator alone is enough to enhance a sentence or to impose it consecutive to another." *Gleason v. State*, 965 N.E.2d 702, 712 (Ind. Ct. App. 2012). Here, the trial court itemized several

aggravating factors.  The trial court did not abuse his discretion by enhancing Mourey's sentence to twenty years, while also finding that two of Mourey's prior convictions supported a finding that he was an habitual offender.

[41]     Affirmed.

Vaidik, C.J., and Riley, J., concur.