## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 26 2020, 10:33 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ryan M. Gardner
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Myriam Serrano-Colon
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Douglas Shumate,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | October 26, 2020<br><br>Court of Appeals Case No.<br>19A-CR-2953<br><br>Appeal from the Allen Superior Court<br><br>The Honorable John Surbeck, Judge<br><br>Trial Court Cause No.<br>02D06-1807-F1-9 |

**Riley, Judge.**

# STATEMENT OF THE CASE

[1] Appellant-Defendant, Douglas Shumate (Shumate), appeals his conviction for child molesting, a Level 4 felony, Ind. Code § 35-42-4-3(b).

[2] We affirm.

# ISSUE

[3] Shumate presents a single issue on appeal, which we restate as: Whether the trial court abused its discretion by admitting certain evidence.

# FACTS AND PROCEDURAL HISTORY

[4] In 2017, Shumate was in a relationship with Lisa Alpin (Alpin) for approximately eight years, and they lived together in Allen County, Indiana. Alpin had a granddaughter, S.A., born on April 6, 2011. In 2017, when S.A. was six years old, she began spending every weekend, or every other weekend, at Shumate's and Alpin's trailer. During the visits, Shumate began molesting S.A. Shumate would put his fingers inside S.A.'s vagina, rub her vagina, and he made S.A. touch his penis. The molestations would occur when S.A. was awake, and other times she would wake up and find Shumate molesting her. Though Alpin was in the home when Shumate was molesting S.A., she would either be in the bedroom sleeping or in the kitchen doing dishes.

[5] In March 2018, approximately one week before S.A.'s seventh birthday, S.A. was playing with some friends at a friend's house, and they were discussing marriage and other adult topics. At some point, S.A. disclosed to her friends

that Shumate had been molesting her. When S.A. returned home, she was crying hysterically, and she informed her mother that Shumate had "touched her" on her "private parts and on her butt." (Transcript Vol. II, p. 34). S.A. stated that the last time Shumate had molested her was two weeks prior. S.A.'s mother immediately called the Department of Child Services (DCS).

[6] On April 4, 2018, S.A. was interviewed by forensic interviewer Lorrie Freiburger (Freiburger). The interview was recorded. While Freiburger spoke with S.A., a DCS representative, a detective, a prosecutor, and a victim's assistant, watched the live video stream of the interview from another room. Freiburger wore a receiver in her ear so that the people remotely watching the interview could send her additional questions via a microphone. S.A.'s mother was not present at the interview.

[7] On April 11, 2018, four days after her seventh birthday, S.A. was examined by a sexual assault nurse examiner (SANE Nurse). S.A. disclosed to the SANE Nurse that Shumate, whom she referred to as "[g]randpa," touched her "private with his hands" both outside and inside her underwear. (State's Exh. 4). S.A. additionally claimed that Shumate's "fingers went inside [her] private" and it "felt like" he used his fingers to touch her "back private too." (State's Exh. 4). S.A. added that Shumate would "make [her] touch his private while he was touching [her] private." (State. Exh. 4). S.A. reported that the molestation began when she was six years old and it happened "lots of times." (State's Exh. Ex. 4). S.A. used the word "private" to describe buttocks, female genitalia, and male genitalia. (State's Exh. 4).

[8]    On July 6, 2018, the State filed an Information, charging Shumate with Count I, child molesting, a Level 1 felony, and Count II, child molesting, a Level 4 felony. On August 21, 2019, the State filed a notice stating that it intended to use the statements of a protected person at trial. Specifically, the State intended to introduce into evidence the statements S.A. made to her mother, and to Freiburger regarding Shumate's molestation.

[9]    On October 1, 2018, the trial court held an evidentiary hearing, during which Freiburger testified, and the recording was admitted into evidence. S.A.'s mother also testified. Although S.A. was made available for cross-examination at the hearing, Shumate decided not to call S.A. as a witness. On the same day, the trial court issued an order concluding that S.A.'s "statements to her mother" regarding the molestation provided "sufficient indications of reliability to be admissible" since the "statements were made spontaneously." (Appellant's App. Vol. II, p. 52). The trial court further determined that the "[s]tatements made to the forensic interviewer [bore] strong indications of reliability for the reason that the interviewer asked open-ended questions, encouraged [S.A.] to correct any mis[]statement the interviewer" made, S.A.'s description of the molestation "included sensory details," and S.A. was honest when "she [was] not absolutely certain of her own statements." (Appellant's App. Vol. II, p. 52). Therefore, the trial court found that S.A.'s statements to her mother, and the forensic interviewer were admissible "pursuant to Indiana Code 35-37-4-6." (Appellant's App. Vol. II, p. 52).

[10]     Shumate's jury trial was held on October 16 and 17, 2019. Over Shumate's objection, S.A.'s videotaped forensic interview was admitted into evidence and played for the jury. Also, over Shumate's hearsay objection, S.A.'s mother testified that S.A. had disclosed to her that Shumate had molested her. At the close of the evidence, the jury found Shumate not guilty of the Level 1 felony, but guilty of Level 4 felony child molesting. On November 15, 2019, the trial court held a sentencing hearing and sentenced Shumate to ten years at the Department of Correction.

[11]     Shumate now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

[12]     "In general, the decision to admit or exclude evidence is within a trial court's sound discretion and is afforded great deference on appeal." *Agilera v. State*, 862 N.E.2d 298, 302 (Ind. Ct. App. 2007), *trans. denied*. We review evidentiary rulings solely for an abuse of discretion, which "occurs where the decision is clearly against the logic and effect of the facts and circumstances before the court." *Carter v. State*, 31 N.E.3d 17, 28 (Ind. Ct. App. 2015), *trans. denied*.

[13]     Shumate contends that S.A.'s molestation allegations made to her mother and at the forensic interview were unreliable and that the trial court abused its discretion in admitting that evidence under the Protected Persons Statute (PPS), Indiana Code section 35-37-4-6 (2018). The PPS governs the admissibility at trial of prior statements by protected persons in certain circumstances and it applies to specific crimes, including the conviction at issue in this case. *See* I.C.

§ 35-37-4-6. The PPS defines a protected person, in relevant part, as "a child who is less than fourteen (14) years of age." I.C. § 35-37-4-6(c). S.A. meets the definition of a protected person under the PPS. The PPS further provides, in relevant part:

> A statement or videotape that:
>
> (1) is made by a person who at the time of trial is a protected person;
>
> (2) concerns an act that is a material element of an offense listed in subsection (a) or (b) that was allegedly committed against the person; and
>
> (3) is not otherwise admissible in evidence;
>
> is admissible in evidence in a criminal action for an offense listed in subsection (a) or (b) if the requirements of subsection (e) are met.

I.C. § 35-37-4-6(d).

Subsection (e) of the PPS, which is at issue here, provides:

> A statement or videotape described in subsection (d) is admissible in evidence in a criminal action listed in subsection (a) or (b) if, after notice to the defendant of a hearing and of the defendant's right to be present, all of the following conditions are met:
>
> (1) The court finds, in a hearing:
>
> (A) conducted outside the presence of the jury; and

(B) attended by the protected person in person or by using closed circuit television testimony as described in section 8(f) and 8(g) of this chapter;

that the time, content, and circumstances of the statement or videotape provide sufficient indications of reliability.

[15]   In the present case, the trial court held a hearing prior to Shumate's jury trial at which S.A.'s mother and Freiburger testified. Although S.A. did not testify, she was outside the courtroom and was available for Shumate to cross-examine. At the close of the evidence, the trial court determined that S.A.'s prior statements regarding the abuse to her mother and Freiburger were reliable.

[16]   We are instructed that, in making the reliability determination under PPS, factors to be considered include the time and circumstances of the statement, whether there was significant opportunity for coaching, the nature of the questioning, whether there was a motive to fabricate, use of age appropriate terminology, and spontaneity and repetition. *Taylor v. State*, 841 N.E.2d 631, 635 (Ind. Ct. App. 2006), *trans. denied*; *see also Trujillo v. State*, 806 N.E.2d 317, 325 (Ind. Ct. App. 2004). Shumate argues that the statements made by S.A. to her mother and Freiburger were not spontaneous and were coached. First, he claims that the State alleged that he molested S.A. between April 7, 2017, and March 23, 2018, and that during that time, S.A. spent the weekends at his house and would return to her home following her visits. According to Shumate, S.A. had "more than ample time . . . to have been influenced by her mom," another adult, or her friends, during that time to make up the

molestation claims against him. (Appellant's Br. p. 13). Shumate also asserts that S.A.'s statements to her mother were not spontaneous because S.A. disclosed the inappropriate touching after she spoke with her friends following a playdate. Shumate further claims S.A.'s statements were unreliable because the interview with Freiburger took place five days after S.A. reported the abuse to her mother. Lastly, he contends that Freiburger inappropriately used leading questions while interviewing S.A. and it appears as if Freiburger coached S.A. since S.A. knew of the word "penis" and not "vagina" and "Freiburger herself used the term vagina when attempting to elicit a statement of inappropriate touching" from S.A. (Appellant's Br. p. 14).

[17] Turning to Shumate's claim that S.A.'s statements were not spontaneous and there was increased likelihood of manipulation from others due to the passage of time, we find that assertion does not automatically render S.A.'s statements unreliable. We have held that while expressing concern that the passage of time tends to diminish spontaneity and increase the likelihood of suggestion, this court has also recognized that there are undoubtedly many other factors in each individual case to be considered. *See Taylor*, 841 N.E.2d at 636. Here, S.A.'s mother testified at the protected persons hearing that S.A. came home one evening following a playdate and S.A. was crying. S.A.'s mother was prompted to question S.A. as to what had occurred. It was at that point that S.A. spontaneously informed her mother that Shumate had "touched her" on her "private parts and on her butt." (Tr. Vol. II, p. 34). S.A. informed her mother that the last time Shumate had molested her was two weeks prior. *See*

*e.g., Taylor*, 841 N.E.2d at 636 (concluding that child victim's statement to mother was spontaneous when, upon being questioned about her behavior, child "just came out and told" mother of molestation); *see also M.T. v. State*, 787 N.E.2d 509, 512 (Ind. Ct. App. 2003) (determining that statement by child victim to her mother was spontaneous where statement was unsolicited and was made when mother was treating a rash on the child). S.A.'s mother's probing when S.A. came home crying did not assume or suggest that S.A. had been inappropriately touched by Shumate. Further, S.A.'s statements to her mother were unsolicited, unprompted, spontaneous, and the record is bare of any evidence that S.A. had any motive to fabricate her story. Therefore, we cannot say that the trial court abused its discretion in concluding that S.A.'s statements to her mother were reliable.

[18] Shumate's other claim that S.A.'s statements at her forensic interview with Freiburger were unreliable because they occurred several days after she reported the abuse to her mother, and that Freiburger used leading questions at the forensic interview, also fails. The record shows that S.A. met with Freiburger for her forensic interview about a week after she spontaneously disclosed the abuse to her mother. S.A.'s mother was not present at the forensic interview and S.A. consistently stated that Shumate had molested her. To the extent that Shumate claims that Freiburger used leading questions at the forensic interview, Freiburger described a forensic interview at the protected persons hearing as a

> structured conversation with a child to elicit details in a neutral, non-leading, narrative, free-falling approach. The purpose of the

interview is to establish the safety of the living arrangements for the child; to see if there were anything that would assist a criminal investigation; and to either collaborate or refute allegations of physical or sexual abuse.

(Prot. Pers. Hrg. p. 14). After the forensic video was submitted, Freiburger was asked to give her opinion of S.A. during the forensic interview. Freiburger stated that during the interview, S.A. was able to correct her when she made a mistake. For instance, when Freiburger mispronounced Shumate's name, S.A. was able to correct her. Freiburger also stated that S.A. was able to give sensory details regarding the abuse which was persuasive evidence that S.A.'s molestation claims were reliable. When asked why sensory details were important, the following exchange occurred:

> [Freiburger]: So, a lot of times when we're working through these investigations a lot of people would like to imply that the [c]hild has been coached and told what to say, when they provide sensory details there are not [the] way those things could be coached to a child because they're just free-flowing information that they would have had to experience to be able to [relay] that information to me during the interview.
>
> [The State]: And just to use one example is there a point in the interview where she talks about maybe there was touching on her butt and on her private part, but she clarifies for you why she thinks that?
>
> [Freiburger]: Right, so [she] had indicated that fingers were placed inside of her vagina, but she wasn't sure whether they were placed in her butt also or when they were on her vagina it made it feel like it was in her butt. So, she was very careful to

explain, I know that they were placed in my vagina and they maybe were placed in my butt because it kind of felt that way, but I don't really know for sure.

[The State]: In your mind, was that a significant sensory detail?

[Freiburger]: That was very significant, yes.

[The State]: Did you have a way, Ms. Freiburger, of verifying that [S.A.] was describing the same body parts that you were talking about?

[Freiburger]: Yes, in fact we use drawing that, because kids don't always use the names that I would like them to use and so, you know, like she used the name down there, and thing, and she did use penis, but we have a drawing of a male and a female that we bring out and I ask them to circle the parts of their body that were involved and then we label them with the words that they use and then I try to use those words throughout the interview. So, just to make sure that we [are] talking about the same body parts, they circle and we identify on the drawings.

[The State]: Do you remember—just one more question about that—do you remember, at some point, her making a gesture to show a behavior that the defendant had done?

[Freiburger]: Yes, she actually [used] her hand to gesture masturbation on a male.

(Prot. Per. Hrg. pp. 20-21). At the close of that protected persons hearing, the trial court issued an order stating in pertinent part that:

The [s]tatements made to the forensic interviewer bears strong indications of reliability for the reason that the interviewer asked open-ended questions, encouraged the child to correct any mis-statement the interviewer might make and the child showed that she was able to do that, described sensory details of the alleged assault, and clearly indicated when she was not absolutely certain of her own statements.

(Appellant's App. Vol. II, p. 52). Based on the record, we agree with the trial court's conclusion that S.A.'s statements at the interview contained sufficient indicia of reliability to be admissible under the PPS. To the extent that Shumate avers that S.A.'s narration of the abuse was coached or that Freiburger used leading questions to render S.A.'s entire interview unreliable, Shumate's argument is unsupported by the evidence. Thus, we hold that the trial court did not abuse its discretion when it admitted into evidence the videorecorded interview of S.A. under the PPS.

## CONCLUSION

[19] Based on the foregoing, we conclude that the trial court did not abuse its discretion in concluding that S.A.'s hearsay statements to mother and to Freiburger at the forensic interview were sufficiently reliable and therefore admissible under the PPS.

[20] Affirmed.

[21] May, J. and Altice, J. concur